James E. Cecchi
Lindsey H. Taylor
CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
(973) 994-1700

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW FERGUSON
WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270

Attorneys for Plaintiff

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| T. DENNY SANFORD,<br><br>     Plaintiff,<br><br>vs.<br><br>PERSHING, LLC,<br><br>     Defendant. | Civil Action No.<br><br>**COMPLAINT and**<br>**DEMAND FOR JURY TRIAL** |

Plaintiff T. Denny Sanford, by way of Complaint against Defendant Pershing, LLC, says:

**PARTIES**

1. Plaintiff, T. Denny Sanford is a citizen of South Dakota residing in Sioux Falls, South Dakota. Plaintiff purchased a SIBL certificate of deposit in May 2005 in the amount of $5 million and a SIBL certificate of deposit in June 2007 in the amount of $10 million.

2. Defendant, Pershing, LLC ("Pershing"), is a Delaware limited liability company, with its principal place of business at 1 Pershing Plaza, Jersey City, New Jersey, 07399. The sole member of Pershing LLC is Pershing Group LLC (a Delaware LLC with its principal place of business in New Jersey) and the sole member of Pershing Group LLC is The Bank of New

York Mellon Corporation (a Delaware corporation with its principal place of business in New York).

## VENUE AND JURISDICTION

3.      This Court has general diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000 exclusive of interest and costs, and there is complete diversity between Plaintiff is a citizen of a different State than Pershing.

4.      Venue is proper in the United States District Court in and for the District of New Jersey pursuant to 28 U.S.C. § 1391(b)(1) as it is the judicial district in which the defendant resides.

## FACTUAL ALLEGATIONS

### A.      Introduction

5.      On February 17, 2009, the FINRA broker/dealer solely owned by Allen Stanford, Stanford Group Company ("SGC"), and solely owned Antiguan bank, Stanford Bank International, Ltd. ("SIBL"), were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws by their intricate involvement in the second largest Ponzi scheme in American history.

6.      Despite numerous red flags, including knowledge that the Securities and Exchange Commission ("SEC") was investigating the sales practices related to the SIBL certificate of deposit ("CD") in 2005, Pershing entered into a clearing agreement on December 27, 2005 with SGC and rendered material assistance to the Allen Stanford Ponzi scheme from 2005 through February 17, 2009. ████████████████████████ ████████████████ As a result, investors who purchased CDs issued by SIBL lost $7.2 billion.  The magnitude of the Stanford Ponzi scheme would have been impossible to achieve

without Pershing's material and indispensible aid in growing SGC and, in turn, substantially increasing the sales of the SIBL CDs.  Pershing's assistance extended far beyond the ministerial functions of clearing trades and wiring funds to purchase CDs, and, as a result, Pershing facilitated the increase of sales of SIBL CDs from approximately $2.8 billion at the end of 2005 (during an approximately 10 year period) to more than $7.2 billion by the end of 2008.

7.      Despite SGC's absolute dependence on the 3% referral fees for CD sales paid by SIBL and on Allen Stanford's continual infusion of cash to maintain the broker-dealer's staggering overhead, Pershing never obtained answers to critical questions that members of its senior management repeatedly articulated as the minimum necessary to determine the legitimacy of the entire Stanford business model anchored by the revenues generated by the sale of CDs. Pershing Executives attempted to meet privately with Stanford Executives as its



Regardless, Pershing never discovered:

- The underlying assets for the purported investment portfolio of SIBL;

- The identity of the money managers for the purported investment portfolio of SIBL;

- How the money managers sustained an annualized return sufficient to cover the 3% referral fees and the overhead of SIBL despite volatile, and for the most part, down global markets;

- Allen Stanford's source of wealth that funded SGC with more than $165,000,000 necessary to make up the consecutive quarterly losses of SGC; and

- Proof that Allen Stanford's "wealth" even existed so as to be able to continue to infuse cash to SGC.

3

8.      Pershing never received answers to any of these questions for the entire three and one-half year period, yet continued to provide vital services to the Stanford entities.  Pershing also knew that SIBL was audited by a one-man accounting firm in Antigua (highly abnormal for this type and size of investment vehicle). Pershing knew the SEC was also investigating Stanford Financial Group ("SFG"), another wholly owned Allen Stanford company.  During the period in which Pershing provided these services, Pershing knew Stanford was subject to virtually nonexistent regulation in Antigua.  These facts, combined with the extended period of time Pershing allowed Stanford to ignore and simply refuse to respond to its repeated questions, are more than sufficient to support the reasonable inference that Pershing had a "general awareness" of Stanford's underlying wrongdoing.  Pershing rendered substantial assistance to Stanford by exercising professional expertise and judgment, all of which was motivated by its own financial interests as well as the financial interests of Stanford.

B.      **Pershing Shed its Rule 382 Protection**

9.      New York Stock Exchange ("NYSE") Rule 382 allowed an introducing broker to enter into a contract with a clearing broker, wherein the clearing agreement between the introducing broker and clearing firm must specify the respective functions and responsibilities of each party.[1]  Essentially, NYSE Rule 382 protected clearing firms from liability for an introducing firm's conduct provided that the clearing firm performed _only_ the ministerial functions delineated in the clearing agreement.  By way of example, NYSE Rule 382 absolved a clearing broker from liability if the clearing firm:

- Provided only "back-office" services;

---

[1]      NYSE Rule 382, though in existence at the time of the Stanford Ponzi scheme, has been replaced by FINRA Rule 4311.

- Provided processing and administrative services in connection with securities transactions;

- Played no role in the introducing firm's sales activities;

- Involved itself in a transaction only *after* a trade had been ordered or otherwise authorized by the customer.

10. Pershing manifestly disregarded the well-settled principles regarding clearing firm liability by materially participating in and aiding and abetting Stanford's wrongdoing.[2]

████Pershing maintained a close relationship with Stanford, acknowledged repeatedly by Pershing's Senior Executives as a ████████████ and ████████████████ that defied the industry standard for a clearing broker. Pershing referenced its partnership with Stanford not only internally, but also in direct communications with Stanford recruits and Stanford personnel. Pershing held itself out as Stanford's ████████████████ in addition to Stanford's clearing firm, a dual role that distinguishes between the processing vendor function of a clearing firm and the trusted business partner function that Pershing engaged in. For example, in order to obtain Stanford's business, Pershing differentiated itself from other clearing brokers ████████████ by its commitment to a strategic business partnership approach as opposed to a role as simply a clearing firm. ████████████████████ ████████████████

12. Pershing removed itself from any possible protection of NYSE Rule 382 by engaging in the following actions:

---

[2]    On December 8, 2014, United States District Judge David Godbey in the Northern District of Texas assigned to oversee the class action, *Turk v. Pershing, L.L.C.*, Civ. Act. No. 3:09-CV-2199-N (N.D. Tex. 2009), and related litigation, ruled that Pershing is <u>not</u> entitled to blanket immunity as a clearing broker and <u>can</u> be held liable as such. A true and correct copy is attached as Exhibit "C." This determination is consistent with the Court's Order in *Kneese v. Pershing, L.L.C.*, Civ. Act. No. 3:10-CV-1908-N (N.D. Tex. 2010), *See* Nov. 14, 2014 Order [21] 8-10 ("*Kneese* Order"). A true and correct copy is attached as Exhibit "D."

- Initiating the recruitment of Financial Advisors ("FAs") for SGC even prior to entering into a contractual relationship with SGC and during its relationship by selling the Pershing/Bank of New York relationship and putting on the ▮▮▮▮▮ ▮▮▮▮ to lend reputational enhancement to Stanford;

- Giving assurances to both recruits and already recruited FAs that Pershing had completed a thorough due diligence on Stanford to eliminate any apprehension that the FAs had about recommending the CD product to their clients despite insufficient or non-existent due diligence;

- Attending and participating in Top Producers Club ("TPC") meetings in which brokers who sold at least $2 million in SIBL CDs were given a "reward trip";

- Exercising professional judgment about whether to accept orders for processing and whether to execute transactions in customer accounts; and

- Ensuring that the introducing broker was meeting net capital and other regulatory requirements.

13.    Moreover, Pershing provided the following additional services that extended beyond the permissible functions and responsibilities allocated to Pershing as a clearing firm:

- Leveraging the Bank of New York Mellon Wealth Management team for private banking products such as lines of credit, standby letters of credit, aircraft loans, unsecured credit, and other lending alternatives;

- Securities Based Lending Solutions, including CreditAdvance, a margin lending product, LoanAdvance, a consumer lending product, RealAdvance, a mortgage solution offered by Bank of New York Mortgage Solutions LLC, and Collateral Monitoring Service;

- Wrap Account Services, including money manager services (buying and selling securities);

- Sales and marketing functions on the broker interface NetExchange Pro;

- Money Management Research (pre-transaction information); and

- Financial Planning Software.

14.    As a result, because Pershing moved well beyond performing routine clearing functions that are post-transactional, ministerial, administrative, and mechanical, Pershing is no

6

longer subject to the protection of NYSE Rule 382 and therefore can and should be held liable for the Plaintiff's losses.

### C.  The Pershing-Stanford Relationship

15.  In May 2005, Pershing began discussions with Stanford management about taking over the role as the custodian and clearing firm for SGC.  Stanford cleared with Bear Stearns, and had continually done so, since SGC began business in 1996.

16.  In 2005, Stanford decided to embark on an ambitious and challenging growth plan for SGC to add over 100 new FAs and to open numerous new branch offices around the world. The anticipated growth of SGC was the impetus for the Pershing-Stanford relationship.  Prior to teaming up with Pershing, Stanford explained its expansion plan that included looking for a strategic partner to assist Stanford in its growth.  Pershing desired to be that partner.

17.  One of the earliest meetings between Pershing and Stanford personnel took place at Pershing's headquarters at Pershing Plaza in New Jersey.  Pershing's senior management was involved in forging the relationship with Stanford.  Claire Santaniello, Pershing's Chief Compliance Officer, and John Ward, its Relationship Manager, were two of the principals involved in the New Jersey meeting.  At the outset, Stanford wanted the credibility of having a relationship with a firm like Pershing.  As demonstrated below, that credibility, or "reputational enhancement," of Pershing was absolutely critical and was called upon time and time again to recruit FAs and grow SGC, and likewise to increase the sale of the SIBL-issued CDs.  Pershing was more than willing to give legitimacy to the Stanford enterprise in exchange for SGC's business.

18.  Eager for Stanford's business, beginning in mid-2005, Pershing commenced its due diligence on Stanford, which essentially proved to be no due diligence at all.  One of

Pershing's expressed goals in conducting due diligence into the Stanford-related companies was to rule out fraud, but because its due diligence was superficial and grossly incompetent (questions asked but never answered), the possibility of fraud was ever-present throughout the three and one-half year relationship. ███████████████████████

████████████████████████████████████████████████████████

██████████████████████ his is simply false.

19.    Pershing performed perfunctory due diligence on the Stanford companies (including SIBL and the ██████ of the Stanford enterprise, the SIBL CD) despite the fact that the clearing agreement signed by Pershing and SGC and Pershing's ████████████████

████████████████████████████████████████████████████████

████████████████████████ Additionally, Pershing was required to

████████████████████████████████████████████████████████

████████████████████████ Pershing was also aware of countless badges of probable criminal activity before and during its relationship with Stanford including:

- Allen Stanford's history of owning a bank on the Island of Montserrat, a known haven for money launderers;

- Stanford moving his bank to the Island of Antigua, with its dubious money laundering history;

- Allen Stanford's push to relax anti-money laundering regulations in Antigua;

- Knowledge of the SEC's investigation in 2005 into the sale of the CDs;

- ████████████████████████████████████████████████████

- ████████████████████████████████████████████████████

- Various news articles that reported investigations by the SEC into the CDs sold by SIBL during the period of time that Pershing was wiring cash to offshore banks where SIBL owned accounts; and

- ████████████████████████████████████████████████████

20.     Although SGC was a United States-based NASD member firm, its affiliation with offshore banks, trust companies and broker-dealers with mostly non-US clients was a stated concern to Pershing.  Moreover, because Pershing viewed Stanford as a very large prospect, it felt the need to have ████████████████████████ In sum, Pershing acknowledged that while Pershing was not directly doing business in Antigua, it was partnering with an entity that received the majority of its revenue from an offshore Antiguan bank.

████ Throughout the "due diligence" process, Pershing became aware of numerous troubling facts about Allen Stanford and the Stanford business model.  ████████████████

████████████████████████████████████████████████████████████████

22.     Many Pershing employees that shared concerns about SIBL and the CDs misrepresented the existence of internal questions to their superiors and to third parties, stating that they were both satisfied and comfortable with the Stanford entities and the CD product in

order to maintain the ever-growing and highly profitable relationship with Stanford.

███ Indeed, there was internal turmoil between the credit risk department and the relationship

management/sales departments over the apparent "red flags" concerning Stanford.

**D.      Pershing Played an Integral Role in Defrauding Over 18,000 Victims**

23.      Pershing rendered material assistance to the Allen Stanford Ponzi scheme by

growing SGC, resulting in $7.2 billion in losses to those investors who purchased SIBL CDs.  As

discussed above, Pershing's assistance went far beyond clearing trades and transferring funds for

the purchase of CDs.  Pershing took many steps to help grow SGC which resulted in a large

increase in sales of the SIBL-issued CDs to investors.

**a.      Pershing was Motivated by the Opportunity to**
**Clear $4.5 Billion in Assets**

24.      From the outset, Pershing was driven by its intense focus upon appropriating

more than $4.5 billion in assets cleared by SGC's previous clearing firm, Bear Stearns.  Pershing

did so despite not only the existence of numerous red flags of highly suspicious activity, but also

Pershing Senior Executives' growing suspicions of the existence of fraud by Stanford.

25.      Pershing worked hard to grow SGC in order to obtain the rest of the accounts that

Bear Stearns still had in late 2006.  Early on in Pershing's discussions with SGC (mid-2005),

Pershing recognized that the ███ for SGC's business model was the SIBL-issued CD offered

to investors throughout the world.  It is, therefore, no coincidence that sales of the CDs exploded

with Pershing at Stanford's side.  From 2005 through the end of 2008, SIBL reported that its CD

deposits had increased from $2.8 billion to more than $7.2 billion.  (By comparison, it took 15

years – from 1986 through 2001 – for deposits to reach $1 billion.)

> **b.      Pershing Ignored the Red Flags and Disregarded Corporate Policy**

26.      Throughout its relationship with Stanford, Pershing discovered numerous red flags that required it to, at a minimum, re-evaluate its relationship with Stanford (prudently, it should have immediately terminated the relationship).  Yet, Pershing carried on business as usual.  For example, Pershing discovered that:

- Allen Stanford forfeited more than $3 million in deposits it held in his bank on the Island of Montserrat that were linked to a Mexican drug lord;

- ██████████████████████████████████████████████████████ ;

- ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ██████████████████████████████████████████████████████ ;

- Pershing had never seen the investment portfolio maintained by SIBL;

- The people running SGC did not know the composition of the SIBL portfolio;

- Essentially, the entire SIBL portfolio was managed by Allen Stanford's right-hand man, James Davis, and Laura Pendergest-Holt, neither of whom had the education or training to manage such a massive portfolio;

- The financial condition and financial statement of SIBL were audited by a one-man accounting firm in Antigua, C.A.S. Hewlett & Co., Ltd. – an accounting firm that no one at Pershing had ever heard of;

- Financial regulators in Antigua (the Financial Services Regulatory Commission, or "FSRC") had no work papers or documentation supporting the assets that SIBL claimed to own;

- It was the regular practice of the FSRC to just accept at face value whatever SIBL and Allen Stanford told the FSRC about its financial condition and portfolio values; and

- Unlike anything Pershing had seen before, SIBL showed a profit in good times and bad.

██████ As a result of these mounting red flags and the lack of disclosure and transparency from Stanford, in early 2008, Pershing requested that SGC hire a third-party accounting firm to validate the balance sheets from SGC and SIBL.  Pershing broached this subject with SGC on many occasions, however, SGC never agreed. ██████████████████████████████

████████████████████████

██████████████████████████████████████████████

13





35.     Notably, Pershing's Chief Compliance Officer, who was also a member of the IEDDC and Pershing's Credit Committee, was not responsible for ensuring that Pershing followed such policies.   Rather, the relationship management team, or sales force, was

responsible for the periodic review of Stanford.  Yet the relationship management team's role with respect to Stanford was to advocate for Stanford.  Pershing enlisted the very employees who worked to secure the relationship with Stanford (despite all the red flags) to be responsible for reviewing Stanford's activity and to determine whether it was suspicious.  Moreover, Pershing's Credit Committee and/or Compliance Department should have assessed the relationship management's periodic review of Stanford due to Stanford's higher risk, yet that never occurred. The Chief Compliance Officer was neither familiar with, nor did she verify, the exact process the relationship management team engaged in to review and approve Stanford on a periodic basis. In fact, it is doubtful that any such mandatory review ever took place.

c.    <strong>Pershing and Stanford Engaged in a </strong>

36.    Pershing often described its relationship with Stanford as a ███████████ and worked tirelessly to help grow the Stanford business.  Pershing was willing to be a partner with SGC and assist in the growth of SGC as its

 In fact, Pershing was willing to be in a ███████████ with Stanford.

d.    <strong>Pershing Recruited Stanford's Financial<br/>Advisors</strong>

37.    From 2005 through February 17, 2009, Pershing played a central role in recruiting preeminent FAs for SGC.  Notably, Pershing recruited FAs for SGC even *before* the clearing agreement was even executed.  Much of Stanford's growth during this time came from a focused effort to recruit top talent from major brokerage firms.  Prior to working at SGC, this select group of FAs had successful careers with valued clients.  Pershing understood that recruiting

15

FAs was critical to growing SGC and SIBL, and that the acquisition of FAs with large books of business was the most efficient way to gain assets. It was common knowledge to Pershing that a certain percentage of assets brought over by the FAs to SGC would be used to purchase SIBL CDs.

38.      As part of the recruiting process, FAs were often invited to the Stanford Houston office for presentations intended to entice them to work at SGC. Pershing personnel, including relationship management executives, participated in the recruiting sessions. A typical recruiting session would be held at Stanford headquarters where the recruits would receive an agenda comprised of scheduled meetings with Stanford personnel as well as specific meetings with Pershing personnel. Often times, a Pershing relationship management executive would attend recruiting meetings as the sole Pershing representative, despite the individual's lack of subject matter expertise on Pershing's technology/operational systems. The relationship management team attended the recruiting meetings simply to sell the ▮▮▮▮▮▮▮▮ and to provide a perspective of the ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ of Pershing/Bank of New York. ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ If Pershing personnel were unavailable to attend the meetings in person, recruits would be escorted into a conference room to conduct a telephone conference with the relationship management team at Pershing.

39.      During recruiting meetings, Pershing would engage in reputational enhancement by supporting Stanford with the Pershing name and the name of its parent company, Bank of New York. Not only would the recruits get to work with Pershing once they joined Stanford, but Pershing would also ▮▮▮▮▮▮▮▮▮▮ *i.e.*, Pershing and the Bank of New York. To the recruits, many of whom had never heard of Stanford before, the support and endorsement by Pershing and the Bank of New York gave instant credibility to the Stanford enterprise. Pershing

16

even admitted to recruits that while Stanford did not have a prominent name in the financial community, its partnership with Pershing/Bank of New York would provide the necessary reputational confirmation to attract clients.

40.    Pershing's name and reputation were invaluable to Stanford.  Pershing was known for being reliable and had a history of working only with first-rate broker/dealers.  Pershing touted itself as having a name that was synonymous with high quality clearing and execution in the industry.  Thus, its strength in endorsing Stanford was critical to any recruit coming from a wire house to a smaller firm.  Some recruits expressed excitement about working with a big name like Pershing because of its gravitas and access to resources.  Consequently, Pershing's representations carried a tremendous amount of weight and were an integral part of the FAs' decision to work at Stanford.

41.    When anyone at Pershing was questioned about its relationship with SIBL, Pershing unequivocally represented to recruits that it had completed its due diligence on Stanford, including SIBL.  In fact, Pershing informed FAs that the due diligence process for Stanford took longer than average due to the vetting process for SIBL.  Although the SIBL CDs were not on its platform, Pershing represented that it completed due diligence on SIBL because it was part of the Stanford business and Pershing was transferring customers' funds to the Bank for the purchase of CDs.  Moreover, Pershing vouched for the SIBL CDs as legitimate investments. Pershing withheld the fact that, internally, it had open questions about SIBL and the CDs that SIBL issued.  Moreover, as Pershing's concerns grew, it never retracted its endorsement of Stanford and the CDs.

17

42.     Based on Pershing's assurances regarding SIBL and support of the CD product, FAs not only recommended investing in the CDs to their clients, but also many FAs personally purchased the CDs and advised their family members to do so as well.

43.     An example of Pershing's involvement in recruiting, with a laser focus on growing SGC and thus the SIBL CDs, was evident in the Stanford Miami office.  The Stanford Miami office was registered with the NASD (later FINRA) as an Office of Supervisory Jurisdiction.  Accordingly, the Miami office was charged with supervision and compliance oversight of all Stanford Latin America branch offices.  Stanford Miami was a unique office in that it was comprised of both SGC brokers and Stanford Fiduciary Investor Services ("SFIS") trust representatives.  The SFIS trust representatives sold only SIBL CDs, while the SGC employees sold SIBL CDs along with other investments.  Although Pershing only cleared the SGC transactions, Pershing was aware that the Miami office was the hub for Latin America and that the SFIS trust representatives were top CD sellers (and invitees of TPC meetings as discussed below).  When Pershing executives visited the Miami office, they would often attempt to entice the SFIS trust representatives to get their securities licenses in order to recruit them to join SGC.

44.     Even after financial advisors were recruited, Pershing executives continued to validate the Stanford enterprise as they attended the TPC meetings, in which brokers who sold at least $2 million in SIBL CDs in any given quarter were given a "reward trip."   The TPC meetings were strictly for advisors who did business with SIBL (SGC business was irrelevant).  Nevertheless, Pershing attended the SIBL-only conferences because Pershing wanted to support and grow the Bank's CD business.

### e.   Pershing Provided Assurances Directly to FAs and Investors

45.     The ongoing assurance of Pershing's relationship with Stanford was a comforting factor in investors' decisions to buy and hold CDs.  The FAs and investors did not have the same degree of access into the bank's portfolio as did Pershing, in theory.  Being told that Pershing had transparency into the bank and was "satisfied" with everything it saw validated the CD program in the eyes of the FAs, assuaged any concerns they might have had, and encouraged the FAs to sell more CDs or recommend that their clients hold existing CDs.  Although FAs were recruited across the country and at different periods of time, they were told nearly identical stories about Pershing's due diligence on Stanford and were given the same sales pitch that Pershing fully backed Stanford, SIBL, and the SIBL CDs.

46.     Pershing assured the FAs that it did its investigation on Stanford and was pleased with the results.  If not, it would have never become Stanford's partner and lend Stanford its name and reputation.  The Pershing investigation, as represented, included travelling to Antigua to visit SIBL on more than one occasion.  After "diving deeply" into SIBL's portfolio, Pershing proclaimed that it was pleased with Stanford's transparency and was very comfortable with the portfolio.  However, this representation to the FAs was false.  Pershing further boasted that SIBL provided a unique product for brokers to sell to their clients, but never informed the FAs that Pershing had numerous open questions about the CD and never retracted its endorsement as its concerns increased.

47.     Pershing reassured the customers of SGC with communications to the FAs designed to reach the investor. Significantly, two representations from Pershing induced holders of the CDs to refrain from redeeming.  First, a mass email was sent on behalf of Pershing's CEO, Richard Brueckner, on October 3, 2008, to all FAs of SGC containing "key facts and

19

information" about Pershing and Bank of New York and their "strong position" to protect clients' assets and mentioning both Securities Investor Protection Corporation and Customer Asset Protection Company.  A true and correct copy of the 10/03/08 email is attached hereto as Exhibit "I."  The intent of this email blast was to assuage any concerns of SGC FAs during the roiling markets of October 2008.  It was also designed to consist of a "comfort email," intended to be disseminated to the customers of each FA so as to prevent market hysteria.  A "Pershing Bulletin" dated December 12, 2008 was also designed to reach the SGC customer in the same manner and for the same purpose.  ████████████████████████████████  The "Pershing Bulletin" included a form letter that the SGC FAs could send to each of his or her customers.  Pershing, however, failed to alert the investors of the numerous suspicious circumstances it had long been concerned about.  Neither the comfort email nor the bulletin put investors on notice that the CDs were not covered by any of the touted insurance or the financial wherewithal of either Pershing or the Bank of New York.

### f.    Pershing Senior Executive Senses Fraud Immediately

48.    Richard Closs is a Senior Executive hired by Pershing in May 2006 as a credit risk manager.  Immediately upon his arrival, he was assigned to conduct an independent review of the SIBL/SGC relationship in order to obtain answers to critical questions that remained outstanding six months after the contract between SGC and Pershing was executed.

49.    Initially, Closs focused Pershing Executives upon the many unanswered questions that were raised from the outset in mid-2005 when the Senior Relationship Manager, John Ward, Global Chief Compliance Officer, Claire Santaniello, and Pershing Attorney, George Arnett, travelled to Antigua for the purpose of conducting due diligence on SIBL.

50.     The goal of Closs' independent review was to identify and verify the source of funds that were supporting SGC in the form of "referral fees."  Specifically, there was concern at Pershing regarding SGC's reliance on the referral fees paid to SGC by SIBL because approximately 60% of SGC's total revenue was produced from the commissions generated by the sales of the SIBL-issued CDs.  Throughout his years of experience, ███████████████ ████████████████████████████████████████████████████  Closs was also concerned that as SGC continued to lose money, more capital infusions to support SGC by Allen Stanford (as the sole shareholder) would be necessary.  Pershing did not know the source and had never verified any aspect of Allen Stanford's purported wealth.

51.     Accordingly, Closs asked for information from Stanford that included, but was not limited to, the following:

- Detail for the source of capital that was used to support the continued losses of SGC;

- Allen Stanford's personal financial statement;

- SGC's projection for revenue growth, capitalization, and continued pay-outs to attract new brokers;

- The investment vehicles that SIBL utilized in managing the portfolio created with the CD proceeds;

- Statements verifying the holdings by outside funds and audited statements of internalized investment options;

- The capacity of SIBL to attract new deposits;

- Maintenance of the high level of return consistently paid on the CDs; and

- Contingency plans should there be a drastic reduction in sales of the CD product and the resulting referral fees.

██████ In the summer of 2006, Closs was especially concerned that Pershing did not have any knowledge of the source of Allen Stanford's wealth.  Despite repeated requests by Pershing,

SGC refused to produce Allen Stanford's personal financial statement. ████████



53.     After approximately three months at Pershing (and still no answers), Closs' concerns grew.  His concerns stemmed from Stanford's failure to provide transparency and outright refusal to share pertinent information.  Because Pershing never received answers to its questions that were designed to rule out fraud, the possibility of Stanford's fraud continued to exist.  Despite all of this, Pershing continued to move ahead and conduct business as usual with SGC.

54.     █████████████████████████████████

██████████████████████████████████████

55.



56.    Following the call, Pershing executives decided to keep Close on a ▮▮▮▮▮▮▮ and away from Pendergest-Holt because his questions created ▮▮▮▮▮▮▮▮ at Stanford and could have jeopardized the budding and highly profitable relationship. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ A Pershing Senior Executive, John Ward, described the Close/Pendergest-Holt telephone conversation ▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ in order to prevent Close from having further access to Pendergest-Holt or anyone at Stanford. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮ In reality, Close was simply trying to get answers to his questions and did not agree with the unjustified criticism he received as a result of the call.  Incredibly, when Pendergest-Holt was invited to visit Pershing three weeks later for ▮▮▮▮▮▮▮▮▮ Close was not included in any meetings, in fact he was never even told she was coming, missing another opportunity to get his questions answered.

57.    During this time, Claire Santaniello, the Global Chief Compliance Officer ("GCCO") and a member of Pershing's Credit Committee, the Risk Management Steering Committee, the IEDDC, the Suspicious Activity Review and Oversight Committee, and

eventually Pershing's Executive Committee, knew that Close had a list of critical questions that needed to be answered. Inexplicably, however, Santaniello let two and a half years pass without ever following up with Close to find out if Pershing had received answers to its outstanding questions despite working with Close and interacting with him on a daily basis.

58.     In August 2007, Pershing Senior Executives met with Stanford Senior Executives to discuss Pershing's continuing concerns.  Again, they did not get any answers.  In yet another attempt to obtain information, Close, Ward and Arnett travelled to Antigua in January 2008 to meet with the regulators of Antigua, FRSC, and the auditor of SIBL, the one-person auditing firm, to review the work papers and the audit of SIBL and its assets.  As Close waited to board the plane for the trip to SIBL, Arnett and Ward informed him that the auditor was not going to be present in Antigua, a fact that they knew much earlier and would have caused Close to cancel the trip had he known in advance. ██████████████████████████████████████

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

████████████████████████ It does not.

59.     By early 2008, after nearly two years of Close' independent review, Pershing still did not have the answers to its critical questions.  In February, 2008 Pershing proposed an independent third-party conduct an audit on SIBL, but it never occurred.  During the summer of 2008, news broke that Stanford was under investigation by the SEC.  By November of that year, Stanford informed Pershing that it would not provide an audited financial statement for Allen Stanford, nor would it acquiesce to Pershing's request to verify the underlying assets.

████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████

24

25



61.     After three years of Stanford's failure to provide transparency and answers to its questions, Pershing executives chose not to terminate the relationship with Stanford.  Instead, on December 12, 2008, the day after Bernie Madoff's arrest, Pershing executives held a second meeting and voted to only terminate the wires to the offshore accounts so as to "incentivize" Stanford to finally provide the information that Pershing had been requesting.  Pershing did not follow through with that decision and let the wiring of funds continue for another month longer, allowing millions of dollars from customer accounts to be sent to SIBL for the purchase of more bogus CDs.

62.



63.    Pershing wanted to ensure that if Stanford turned out to be running a Ponzi scheme like Bernie Madoff, its exposure was limited, but it took no action whatsoever to protect any investors.

**E.    Pershing Does Anything It Can To Maintain Its Relationship With Stanford.**

64.    ██████████████████████████████████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

██████ In early January 2009, the relationship management team actually re-introduced Stanford's request that it had made earlier in 2008 for a re-pricing of Pershing's fees charged for various clearing services.  In essence, Stanford was asking Pershing to lower its fees and charges to Stanford as an accommodation for its growing "business opportunity" that it was providing to Pershing.  Previously, in the spring of 2008, Stanford was notified by Pershing that no re-pricing would even be considered until all of the long-outstanding questions were completely answered and Pershing was comfortable with Stanford's CD business.  ████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████  As a result of Pershing's decision to stop the wiring of funds to Stanford's offshore accounts used to purchase the CDs, Pershing executives actually believed that stopping the wires provided a "path forward" to continuing its profitable relationship with Stanford.  Because Pershing was concerned that the termination of

the wires could adversely impact its relationship with Stanford, the decision was made at Pershing to not only grant Stanford's request for a re-pricing of Pershing services, but also to provide Stanford with a <u>contract extension</u>. Pershing had learned that Stanford considered terminating Pershing and hiring another clearing firm or making an attempt to become a self-clearing firm. ███████████████████████████████████████████████

████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████████

66.    Finally, despite never receiving answers to any of its critical questions for over three years, being lied to by numerous Stanford executives and officers about its business, business practices, and inability to answer certain questions, Stanford's complete lack of transparency in general, countless suspicious activities which raised serious concerns within key departments at Pershing, ████████████████████████████████████████ ██████████████████████████████████ Pershing elected to continue its relationship with Stanford and to "conduct business as usual."

67.    In fact, in early February 2009, just two weeks prior to the SEC's raid on Stanford headquarters, Pershing confirmed its ██████████████████████████████████ through its willingness to re-price its fees and to provide Stanford with a contract extension, thus assuring Stanford that the re-pricing would provide Stanford with more money to use for its recruiting efforts, which would consequently bring in more assets and accounts to be cleared by Pershing. This plan was a ██████████████████ for both Stanford and Pershing. ████████████

████████████████████████████████████████ In short, despite everything that occurred, the only obstacle that stopped Pershing from continuing with its partnership with Stanford was the February 17, 2009 raid of Stanford's headquarters by federal authorities that shut Stanford down. Pershing's willingness and desire to remain Stanford's loyal partner continued until that day.

## COUNT ONE
## PARTICIPATION IN BREACH OF FIDUCIARY DUTY

68.    Plaintiff repeats the allegations set forth in Paragraphs 1 through 67 above as if fully set forth herein.

69.    As an SEC registered investment advisor and as a NASD/FINRA registered broker/dealer, SGC owed fiduciary duties to the Plaintiff as a matter of law. SGC breached its fiduciary duties by advising Plaintiff to invest in the SIBL-issued CDs because the CD investments were imprudent and unsuitable for any investor and because SGC was financially incentivized by SIBL to recommend the CDs, a non-conventional private placement, to its customers. SGC did not have sufficient knowledge in its possession with respect to the bona fides of SIBL, its creditworthiness, the risks and rewards associated with the CD that SIBL issued, the CD's liquidity or interest rate risks and the factors that determine those risks. SGC also breached its fiduciary duties even though it lacked sufficient information regarding the investment portfolio created by SIBL with the proceeds from the sale of the CDs or the money managers who invested and managed the portfolio,

70.    Pershing knew that SGC owed fiduciary duties to the Plaintiff as mandated by law and it knew that SGC was breaching those duties as described herein. With full knowledge of the pervasive breaches by SGC, Pershing conspired with and substantially aided and abetted and otherwise participated in SGC's breaches. Pershing's substantial participation in breaches of

28

fiduciary duties is a proximate cause of actual damages to the Plaintiff.  Pershing knew or should have known that its substantial aiding and abetting and participation in the breaches of fiduciary duties as set out above would result in extraordinary harm to the Plaintiff.

71.    Plaintiff seeks an award against Pershing of actual damages.

## COUNT TWO
## FRAUD

72.    Plaintiff repeats the allegations contained in Paragraphs 1 through 71 above as if fully set forth herein.

73.    Pershing defrauded Plaintiff because it possessed a general awareness that its role was part of an overall activity that was improper.  Pershing was aware of a number of red flags concerning the CDs issued by SIBL yet continued to provide services to the Stanford entities including SGC.  For example, Pershing knew that SIBL was audited only by a one-man accounting on the Island of Antigua and that this was abnormal for an investment portfolio the size of which was purportedly owned by SIBL.

74.    Pershing's general awareness was also based on the fact that Pershing knew that the SEC was investigating the Stanford Financial Group during the period of time that Pershing was providing services to SGC; that Pershing knew that Stanford was subject to virtually nonexistent regulation in Antigua; that Pershing continued to lobby SGC to procure an audit from a reputable auditing firm yet was consistently delayed and/or refused; and that the numerous red flags remained unanswered for many months during Pershing and SGC's relationship.

75.    Pershing also defrauded the investors of SGC, including the Plaintiff named herein, by making fraudulent statements to the SGC FAs that Pershing intended to be relayed to the FAs' customers.  These fraudulent communications included, but were not limited to,

29

advising FAs and prospective FAs that Pershing had completed its due diligence into SIBL and the CDs SIBL issued and gave them both its stamp of approval; the statements by the Chief Executive Officer of Pershing contained in a blast email in October 2008 to the FAs of SGC advising them to remain calm in a turbulent stock market because of Pershing's financial strength and the financial strength of its parent company, Bank of New York Mellon; and sending a "Pershing Bulletin" in December 2008 to the FAs with a form letter for the FAs to send to their SGC customers advising them of the financial strength of Pershing and Bank of New York Mellon and that the customers' assets were covered by other forms of insurance.

76.    The general awareness by Pershing of the above described factors imputes specific knowledge by Pershing of wrongdoing by Stanford which is tantamount to scienter and forms the basis for this common law fraud cause of action.

77.    Plaintiff seeks an award against Pershing of actual damages.

**WHEREFORE**, Plaintiff demands judgment against Defendant for:

a.    Rescission, including consideration paid for the CDs plus interest earned thereon from the date of payment; and

b.    Actual damages, including applicable interest; and

c.    Such other relief as the Court may deem just.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:___/s/ James E. Cecchi_____
          JAMES E. CECCHI

Dated:  October 30, 2015

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515

30

South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW
 FERGUSON WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270

## JURY DEMAND

The undersigned hereby demands a trial by jury as to all issues so triable.

CARELLA, BYRNE, CECCHI,
OLSTEIN, BRODY & AGNELLO, P.C.
Attorneys for Plaintiff

By:    /s/ James E. Cecchi
JAMES E. CECCHI

Dated:  October 30, 2015

Michael E. Criden, Esq.
Lindsey C. Grossman, Esq.
CRIDEN & LOVE, P.A.
7301 SW 57th Court, Ste. 515
South Miami, Florida 33143
(305) 357-9000

Scott D. Hirsch, Esq.
Charles E. Scarlett, Esq.
SCARLETT & HIRSCH, P.A.
7777 Glades Road, Ste. 200
Boca Raton, Florida 33434
(561) 278-6707

Robert C. Gilbert, Esq.
KOPELOWITZ OSTROW
 FERGUSON WEISELBERG GILBERT
2525 Ponce de Leon Blvd., Suite 625
Coral Gables, Florida 33134
(305) 384-7270