IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION

| | | |
|---|---|---|
| T. DENNY SANFORD, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | Civil Action No. 3:15-CV-03832-N |
| | § | |
| PERSHING, LLC, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM OPINION AND ORDER

This Order addresses Defendant Pershing LLC's ("Pershing") motion for summary judgment [57]. Because the Court cannot find that Plaintiff T. Denny Sanford's claims are time-barred as a matter of law, and genuine disputes of material facts exist regarding all elements of Sanford's claims, the Court denies Pershing's motion for summary judgment.

## I. THE ORIGINS OF THE DISPUTE

This case arises out of R. Allen Stanford's infamous Ponzi scheme. The facts associated with Stanford's scheme are well established, *see, e.g., Janvey v. Democratic Senatorial Campaign Comm., Inc.*, 712 F.3d 185, 188–89 (5th Cir. 2013), and will not be recounted in great depth here. In short, Stanford's scheme entailed the sale of fraudulent certificates of deposit ("CDs") through an offshore bank located in Antigua, known as Stanford International Bank Limited ("SIBL"). Although Stanford represented to investors that the CD proceeds were invested only in low-risk, high-return funds, in reality the proceeds were funneled into speculative real estate investments and used to fund Allen

MEMORANDUM OPINION AND ORDER – PAGE 1

Stanford's extravagant lifestyle.   On February 17, 2009, the Securities and Exchange Commission ("SEC") issued a report charging Stanford and his entities with fraud.

Sanford purchased two SIBL CDs through Stanford-entity Stanford Group Company ("SGC") in 2005 and 2007, respectively, totaling $15 million.  Pl.'s App. 0002 [63-2].  Sanford lost his investment when Stanford's scheme was exposed.  Pershing served as clearing broker for SGC, Stanford's Houston broker–dealer.  Sanford alleges that in doing so Pershing provided material assistance to Stanford's scheme.  This allegation is the basis for Sanford's claims against Pershing for participation in a breach of fiduciary duty and for common-law fraud.  Sanford is not the only Stanford investor to assert claims against Pershing for its alleged involvement in Stanford's scheme.  A group of Stanford investors sued Pershing on behalf of a putative class in *Turk v. Pershing*, Case No. 3:09-CV-2199-N (N.D. Tex., filed Nov. 18, 2009) (the "*Turk* Case"), asserting claims for violations of the Texas and Florida securities acts, respectively.  The *Turk* plaintiffs sought class certification on May 14, 2010.  On June 8, 2012, the *Turk* plaintiffs filed an amended class complaint asserting additional class claims for participation in a breach of fiduciary duty and negligence.  Sanford filed his complaint on October 30, 2015.  Original Complaint [1].

Pershing previously moved to dismiss Sanford's claims on statute of limitations grounds.  Def.'s Mot. to Dismiss [11].  The Court denied Pershing's motion to dismiss because it determined that reasonable minds could differ regarding when Sanford's claims accrued, and thus could not conclude as a matter of law that Sanford's claims were untimely.  Order (May 31, 2016) [21].  Pershing now moves for summary judgment,

MEMORANDUM OPINION AND ORDER – PAGE 2

arguing that Sanford's claims are time barred, Sanford cannot establish the elements of his fraud claim, and Sanford's participation in breach of fiduciary duty claim fails on the merits.

## II. SUMMARY JUDGMENT STANDARD

Courts "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).  In making this determination, courts must view all evidence and draw all reasonable inferences in the light most favorable to the party opposing the motion.  *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962).  The moving party bears the initial burden of informing the court of the basis for its belief that there is no genuine issue for trial.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

When a party bears the burden of proof on an issue, he "must establish beyond peradventure all of the essential elements of the claim or defense to warrant judgment in [his] favor."  *Fontenot v. Upjohn Co.*, 780 F.2d 1190, 1194 (5th Cir. 1986) (emphasis omitted).  When the nonmovant bears the burden of proof, the movant may demonstrate entitlement to judgment by either (1) submitting evidence that negates the existence of an essential element of the nonmovant's claim or affirmative defense or (2) arguing that there is no evidence to support an essential element of the nonmovant's claim or affirmative defense.  *Celotex*, 477 U.S. at 322–25.

Once the movant has made the required showing, the burden shifts to the nonmovant to establish that there is a genuine issue of material fact such that a reasonable jury might

return a verdict in its favor. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986). Factual controversies are resolved in favor of the nonmoving party "'only when an actual controversy exists, that is, when both parties have submitted evidence of contradictory facts.'" *Olabisiomotosho v. City of Houston*, 185 F.3d 521, 525 (5th Cir. 1999) (quoting *McCallum Highlands, Ltd. v. Washington Capital Dus, Inc.*, 66 F.3d 89, 92 (5th Cir. 1995)).

### III. SANFORD'S CLAIMS ARE NOT TIME-BARRED AS A MATTER OF LAW

Pershing first argues that both of Sanford's claims are time-barred. Under New Jersey law, both fraud and participation in breach of fiduciary duty claims are subject to a six-year statute of limitations.[1]  N.J.S.A. § 2A:14–1; *see generally S. Cross Overseas Agencies, Inc. v. Wah Kwong Shipping Grp., Ltd.*, 181 F.3d 410, 425 (3d Cir. 1999) (applying New Jersey statute of limitations to fraud claim); *McFadden v. Pentagon Fed.*

---

[1] This Court applies the choice of law rules of the transferor court, the United States District Court of New Jersey. *See Smith v. Waste Mgt., Inc.*, 407 F.3d 381, 384, n.1 (5th Cir. 2005); *see also In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 97 F.3d 1050, 1055 (8th Cir. 1996) ("When considering questions of state law [in a multidistrict litigation], the transferee court must apply the state law that would have applied to the individual cases had they not been transferred for consolidation."). In diversity cases, federal courts "apply the choice-of-law rules of the forum state." *See Scott v. PNC Bank, Natl. Assn.*, 785 Fed. Appx. 916, 919 (3d Cir. 2019) (quoting *Pac. Emps. Ins. Co. v. Glob. Reins. Corp. of Am.*, 693 F.3d 417, 432 (3d Cir. 2012). New Jersey applies the Second Restatement of Conflict of Laws approach to resolve choice of law issues with respect to the statute of limitations and substantive tort law. *See McCarrell v. Hoffmann-La Roche, Inc.*, 153 A.3d 207, 210 (N.J. 2017); *P.V. ex rel. T.V. v. Camp Jaycee*, 962 A.2d 453, 460 (N.J. 2008). Pershing proposes South Dakota, Sanford's state of residence at the time of filing, as another potentially interested state. Under the Second Restatement framework, the Court determines New Jersey's statute of limitations and substantive law applies to Sanford's claims.

MEMORANDUM OPINION AND ORDER – PAGE 4

*Credit Union*, 2023 WL 4777219, at *4 (N.J. Super. App. Div. 2023).  New Jersey's "discovery rule" acts as an equitable exception to the statute of limitations.  *See S. Cross Overseas Agencies, Inc.,* 181 F.3d at 425 (fraud); *Catena*, 145 A.3d at 1090–91 (fraud); *McFadden*, 2023 WL 4777219, at * (breach of fiduciary duty).  The discovery rule tolls the accrual date of a claim in situations where "the injured party either does not know of his injury or does not know that a third party is responsible for the injury." *Ben Elazar v. Macrietta Cleaners, Inc.*, 165 A.3d 758, 764 (N.J. 2017).  When it applies, the discovery rule "delays accrual of the action until the plaintiff discovers, or by exercise of reasonable diligence and intelligence should have discovered, facts which form the basis of a cause of action." *Henry v. N.J. Dep't of Human Serv.'s*, 9 A.3d 882, 892 (N.J. 2010) (internal citation and quotation marks omitted).  The party seeking to invoke the discovery rule has the burden of establishing it applies.  *Catena v. Raytheon Co.*, 145 A.3d 1085, 1090 (N.J. Super. Ct. App. Div. 2016) (citing *Lopez v. Swyer*, 300 A.2d 563 (N.J. 1973)).  Because reasonable minds could differ as to when Sanford discovered, or should have reasonably discovered, his injury, the Court cannot say as a matter of law that limitations began to run in February 2009.[2]  Accordingly, the Court denies summary judgment on this ground.

---

[2] For the purposes of this motion, the Court does not reach the question of New Jersey's application of *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), which governs tolling during the pendency of class proceedings.  If the limitations clock began ticking on November 18, 2009, Sanford's October 30, 2015, complaint was timely — filed within six years — even absent *American Pipe* tolling.  Conversely, if the limitations clock began ticking in February 2009, Sanford's complaint was untimely even with *American Pipe* tolling.

MEMORANDUM OPINION AND ORDER – PAGE 5

Under New Jersey law, the applicability of the discovery rule turns on an objective inquiry — "whether the facts presented would alert a reasonable person, exercising ordinary diligence, that he or she was injured due to the fault of another," so as to warrant starting the statute of limitations running. *Caravaggio v. D'Agostini*, 765 A.2d 182, 187 (N.J. 2001). New Jersey courts have clarified that "where a plaintiff knows of an injury and that the injury is due to the fault of another, he or she has a duty to act," *Ben Elazar*, 165 A.3d at 767–68 (quoting *Caravaggio*, 765 A.2d at 189), but when a plaintiff "know[s] they have suffered an injury but do[es] not know that it is attributable to the fault of another, . . . her cause of action does not accrue until she has knowledge of the injury and that such injury is the fault of another." *Caravaggio*, 765 A.2d at 187. Furthermore, in situations where "a plaintiff knows of an injury, and knows that it is the fault of another, but is reasonably unaware that a third party may also be responsible, the accrual clock does not begin ticking against the third party until the plaintiff has evidence that reveals his or her possible complicity." *Id.* at 189.

Pershing argues that Sanford's October 30, 2015, complaint is untimely because Sanford was or should have been aware of his injury and claims on or about February 17, 2009, more than six years before Sanford filed suit. Def.'s Br. 11–12. Specifically, Pershing points out that the SEC announced it had shut down the Stanford entities and brought fraud charges against them on February 17, 2009, that shortly thereafter Pershing's relationship with SGC was widely publicized, and that Sanford requested a $10,000,000 loan from SIBL against his SIBL CDs in February 2009. *Id*; Def.'s Reply 4 (citing Def.'s App., PER-APP-2561 [57-3]). On the other hand, Sanford maintains that he was not on

notice that he was injured by Pershing, or had claims against it, until the complaint in the *Turk* Case was filed on November 18, 2009.  Pl.'s Resp. 10.  Sanford disputes that any media coverage connecting Pershing to the Ponzi scheme alerted him to his potential claims because it "focused solely on *Stanford's* wrongdoing . . . [whereas] Pershing was touted as the 'good guy' . . . ." Pl.'s Resp. 10 (emphasis in original).  On this evidence, a genuine dispute of material fact exists as to when Sanford was aware, or in the exercise of ordinary diligence would have been aware, that Pershing allegedly contributed to his injury.

In support of its statute of limitations argument, Pershing also highlights that other plaintiffs filed suit against Pershing only two months after the February 2009 SEC filing.  Def.'s Br. 12 (citing Def.'s App., PER-APP-0630).  As such, Pershing argues, Sanford, like those plaintiffs, was or should have been aware of his claims well in advance of the filing of the November 2009 *Turk* complaint.  Def.'s Br. 12.  While the Court can take judicial notice of public federal court pleadings, the mere fact of other pleadings naming Pershing as a defendant does not demonstrate Sanford's purported knowledge of his claim.  Reasonable minds could differ as to whether other suits predating the *Turk* complaint or any media coverage should have notified Sanford of his potential claims against Pershing.  Thus, the Court cannot hold as a matter of law that limitations began to run in February 2009.

The Court likewise declines to hold that Sanford's claim accrued on November 18, 2009.  Sanford urges the Court to do so by highlighting that this Court assumed for summary judgment purposes that the statute of limitations of plaintiffs' claims in a related case, *Weatherly, et al. v. Pershing, LLC*, Case No. 3:14-cv-0366-N (N.D. Tex. 2018),

MEMORANDUM OPINION AND ORDER – PAGE 7

began on November 18, 2009, when the *Turk* case was filed.  Pl.'s Br. 11.  However, in

that case, the Court did not hold that plaintiffs' claims accrued on that date or reach the

issue of whether the discovery rule applied to those plaintiffs' claims because "even

assuming Plaintiffs' [claims] did not begin accruing until November 18, 2009, their claim

[was] still two days untimely."  Order (July 12, 2018) at 5 [152], in *Weatherly, et al. v.*

*Pershing, LLC*, Case No. 3:14-cv-0366-N (N.D. Tex. 2018).  Given the differing context,

the Court's reasoning in *Weatherly* does not support a finding that Sanford's claims accrued

on November 18, 2009.  Because there are genuine issues of material fact as to when

Sanford discovered or reasonably should have discovered that Pershing allegedly

contributed to his injuries, the Court denies summary judgment on statute of limitations

grounds.[3]

## IV. THE COURT DENIES SUMMARY JUDGMENT ON SANFORD'S COMMON LAW FRAUD CLAIM

Sanford's indirect fraud claim stems from the allegation that Pershing made

fraudulent statements to SGC financial advisors that it intended to be relayed to investors,

like Sanford.  Original Complaint ¶ 75.  Pershing argues that it is entitled to summary

---

[3] The Court likewise denies Pershing's request for a *Lopez* hearing.  Under New Jersey law, "[t]he application of the discovery rule is for the court, not a jury, to decide," typically at a pre-trial *Lopez* hearing.  *Catena.*, 145 A.3d at 1090 (citing *Lopez*, 300 A.2d at 563).  However, the Third Circuit, in applying the *Erie* doctrine, held that "the federal policy favoring jury decisions of disputed fact questions must prevail over the state practice of allocating to the court the decision as to the time of discovery of the cause of action."  *Goodman v. Mead Johnson & Co.*, 534 F.2d 566, 573 (3d Cir. 1976).  Accordingly, "the *Lopez* procedure of having the judge resolve discovery rule issues via an evidentiary hearing does not apply in federal court."  *Diaz v. C.R. Bard, Inc.*, 2023 WL 3452667, at *6, n.6 (D.N.J. 2023) (citing *Goodman*, 534 F.2d at 571–73).

judgment on Sanford's fraud claim because (1) any claim related to any CDs purchased prior to December 27, 2005, constitute impermissible holder claims, and (2) Sanford has not provided sufficient evidence to establish any of the elements of indirect fraud. The Court addresses each argument in turn.

### A. Sanford's Claims for CD's Purchased Prior to December 27, 2005, are Not Barred As a Matter of Law

As a threshold matter, the Court declines to find that Sanford's claims related to his May 2005 SIBL CD purchases are precluded as a matter of law. Although Pershing and SGC had no formal clearing relationship prior to December 27, 2005, Sanford alleges that that Pershing made misrepresentations prior to this date that were indirectly relayed to him in the process of purchasing his SIBL CD's and that Pershing's misrepresentations induced him to refrain from redeeming his SIBL CD's. Pl.'s Resp. 23, 27. Claims alleging reliance in the form of failure to sell or purchase securities are often classified as "holder claims." *In re WorldCom, Inc. Securities Litig.*, 2006 WL 752770, at *2 (S.D.N.Y. 2006) ("A 'holder' action is one in which the plaintiffs allege that material misrepresentations or omissions caused them to retain ownership of securities that they acquired prior to the alleged wrongdoing."). In *Blue Chip Stamps v. Manor Drug Stores*, the United States Supreme Court barred "holder claims" in the context of federal securities law but did not extend that holding to claims alleging inducement not to purchase or sell in the context of state common law claims. *See* 421 U.S. 723, 755, 738, n.9 (1975) (noting that the disadvantage of barring holder claims in the Rule 10b-5 context "is attenuated to the extent that remedies are available to nonpurchasers and nonsellers under state law"). Pershing

MEMORANDUM OPINION AND ORDER – PAGE 9

asks this Court to bar Sanford's claims based on SIBL CDs purchased in May 2005 on the ground that they constitute impermissible holder claims. However, no New Jersey court has ruled on the viability of holder claims in the context of common law fraud or indirect fraud. Because no New Jersey court has precluded such claims, this Court will not do so now.

In support of its argument, Pershing highlights a portion of the reasoning of the United States District Court of New Jersey in *Gutman v. Howard Sav. Bank*, 748 F. Supp. 254 (D.N.J. 1990). The *Gutman* court declined to impose a "purchase or sale requirement" on a New Jersey common law fraud claim in part because the plaintiffs "had direct dealings with defendants in which the latter made certain of the representations complained of," which did not implicate any of the policy concerns associated with holder claims outlined in *Blue Chip Stamps*. *Gutman,* 748 F. Supp. at 266. Sanford's fraud claim is an indirect one based on misrepresentations Pershing allegedly made to SGC financial advisors that were, in turn, communicated to investors like Sanford. Even so, the Court takes note that the *Gutman* court also reasoned that the "public policy underlying the actionability of fraud exists regardless of whether plaintiff is induced to act or refrain from action," and held "that the Supreme Court of New Jersey would decide that, as a general rule, reliance in a fraud or negligent misrepresentation claim consists of action or inaction induced by a misrepresentation." *Id.* at 264.

Without a clear decision from a New Jersey court barring holder claims in the context of direct or indirect fraud claims, this Court will not exclude such claims here. *See id.* at 266 ("In the absence of a decision on point from any New Jersey court, this Court

MEMORANDUM OPINION AND ORDER – PAGE 10

will not impose a purchase or sale requirement."). Accordingly, the Court declines at this time to find Sanford's claims based on CD's purchased prior to December 27, 2005, inviable as a matter of law.

### B. Sanford Has Raised a Fact Issue Regarding All Elements of Indirect Fraud

Common law fraud under New Jersey law consists of five elements: "(1) a material misrepresentation of a presently existing or past fact; (2) knowledge or belief by the defendant of its falsity; (3) an intention that the other person rely on it; (4) reasonable reliance thereon by the other person; and (5) resulting damages." *Allstate New Jersey Ins. Co. v. Lajara*, 117 A.3d 1221, 1231 (N.J. 2015) (internal quotation marks omitted). When a plaintiff hears defendant's alleged misrepresentation from a third-party instead of directly from the defendant, that plaintiff may attempt to prove his or her fraud claim through the principle of indirect reliance. *Kaufman v. i-Stat Corp.*, 754 A.2d 1188, 1195 (N.J. 2000); *Wilson v. McCann*, 2014 WL 5326173, at *5 (N.J. Super. Ct. App. Div. 2014). Indirect reliance is established where "a party to a transaction makes a false statement to another party, intending or knowing that the other party in the transaction will hear it and rely on it, and the second party to the transaction actually hears the substance of the misrepresentation, by means however attenuated, and considers the actual content of that misrepresentation when making the decision to complete the transaction." *Kaufman,* 754 A.2d at 1196–97.

To prevail on his indirect fraud claim, Sanford will ultimately have to provide evidence showing that: (1) Pershing employees knowingly made material false statements

to financial advisors at SGC; (2) Pershing intended for Sanford to hear and rely on those materially false statements; (3) SGC financial advisors actually passed those false statements on to Sanford; and (4) Sanford actually and reasonably relied on those false statements in investing in the CDs. Pershing argues that there is no evidence that Pershing made any actionable misrepresentations, that Pershing intended to induce reliance, that Sanford's financial advisor "made any representations to [Sanford] regarding Pershing in connection with his SIBL CD purchases," "that Pershing employees said or played any role in the [financial advisor]'s efforts to sell SIBL CDs," or that Sanford actually relied on any statements by Pershing. Def.'s Br. 18; Def.'s Br. 26 (citing *McCormac*, 904 A.2d at 784–85). The Court disagrees. A genuine dispute of material fact exists as to all elements of Sanford's fraud claim. Accordingly, summary judgment on this claim is denied.

*1. Sanford's Evidence* – Sanford has identified the sworn testimony of SFIS Trust Advisor Elias Barbar, SGC Financial Advisors Roberto Pena and Randall Pickett,[4] and Sanford's SGC Financial Advisor, Scott Notowich, as well two written communications from Pershing in an effort to show that Pershing made misrepresentations about the SIBL CDs that were intended to be dispersed to SGC investors and were eventually passed on to and relied upon by Sanford.

Sanford first points to testimony from Barbar regarding his comfort and reassurance concerning the SIBL CDs he found from Pershing's relationship with SGC, that he made

---

[4] The Court rejects Pershing's argument that, because they did not directly advise Sanford, the testimony of Barbar, Pena, and Pickett is irrelevant to Sanford's indirect fraud claim. *See* FED. R. EV. 401.

a practice of explaining that relationship to potential investors, and that Pershing represented to SGC employees that Pershing had performed extensive due diligence on Stanford and encouraged the use of Pershing's reputation to sell the SIBL CDs.[5]  Pl.'s Resp. 24; Def.'s App., PER-APP-2491–93.  Pena similarly testified that he was explicitly authorized to use the name Pershing to make the SIBL CDs "easier to sell" to potential investors.  Pl.'s Resp. 25 (citing PER_APP_2098, 2089–90 [129-8], in *Weatherly*).  In Pickett's testimony, he explained the assurances Pershing representatives gave about the SIBL CDs, including that Stanford was "clean and clear," Pl.'s Resp. 8 (citing PL_APP_0569–70 [130-3], in *Weatherly*), and its involvement in his SGC financial advisor recruiting process.  Pl.'s Resp. 26; PL_APP_0570, in *Weatherly*.

Sanford's advisor, Notowich, provided a declaration stating, among other things, that "Pershing personnel regularly assisted in the recruiting of [financial advisors] to SGC.  When an advisor was being recruited to Stanford, it was SGC's practice to set up conference calls between the recruits and Pershing personnel, because Pershing had expressed its willingness to assist in the recruiting process to help the recruits become comfortable with the Stanford enterprise;" and "[he] understood that Pershing had the

---

[5] Pershing objects to Barbar's testimony on two additional bases: 1) hearsay and 2) lack of personal knowledge.  The Court overrules the objections.  Barbar's statements that SGC employees told him that Pershing employees represented that Pershing was satisfied with the due diligence it performed on Stanford and recommended that financial advisors use Pershing's name to sell the SIBL CDs are not hearsay for the purposes of Sanford's indirect fraud claim.  *See* FED. R. EV. 801(c), (d).   Barbar's testimony is sufficiently based on personal knowledge.  *See* FED. R. CIV. P. 56(c).

MEMORANDUM OPINION AND ORDER – PAGE 13

ability, and further, was required to perform substantial due diligence on Stanford prior to entering into a partnership with Stanford."[6]  Notowich Declaration ¶¶ 5–6 [63-2].

In addition to that testimony, Sanford points to two written communications from Pershing that he contends contain misinformation that "induced the holders of the CDs, such as Plaintiff, to refrain from redeeming" to support its claims.  Pl.'s Resp. 27.  The first communication is an email dated October 3, 2008, from Pershing Chief Executive Officer, Richard Brueckner's, email address to all SGC financial advisors (the "Brueckner Email").  *Id.*; PL_APP_0312–13 [130-3], in *Weatherly*.  Brueckner testified that the intended purpose of this communication was to reassure investors and clients.  Pl.'s Resp. 27; *see* Pl.'s App., PL. APP. 0006 [85-2], in *Bronstein, et al. v. Pershing, LLC*, Case No. 3:15-cv-748-N-BQ (N.D. Tex. 2017).  The second communication was a bulletin from December 12, 2008 (the "Pershing Bulletin") which contained a sample letter financial advisors could send to their customers to "assure [them] that the safety and security of [their] assets are of paramount importance . . . ."[7]  Pl.'s Resp. 27–28; PL_APP_0314–17, in *Weatherly*.

---

[6] Pershing argues Notowich's declaration should be disregarded because it lacks a foundation in personal knowledge, is conclusory, and is irrelevant. Def.'s Reply 12–13. The Court disagrees.  Contrary to Pershing's position, Notowich does not purport to testify as to the specifics of what Pershing's due diligence process would entail.  His testimony regarding his own understanding and experiences with Pershing as an SGC financial advisor is sufficiently based on his personal knowledge and is relevant to Sanford's indirect fraud claims.  *See* FED. R. CIV. P. 56(c); FED. R. EV. 401.

[7] The Court rejects Pershing's argument that the Brueckner Email and Pershing Bulletin are irrelevant to Sanford's indirect fraud claim.  Unlike in *Weatherly*, where this Court found that these communications could not establish direct inducement under Florida law because they were not "particular to the Stanford CDs," "primarily consist of information about Pershing," and "were not sent to nor do they attempt to directly address investors," Sanford's claim is one of indirect reliance under New Jersey law.  Order (June 23, 2015) at 5–6 [47], in *Weatherly*.

MEMORANDUM OPINION AND ORDER – PAGE 14

*2. Pershing has not demonstrated entitlement to judgment as a matter of law.* – The Court disagrees with Pershing's assertion that there is no evidence to support any element of indirect fraud. Sanford has identified evidence sufficient to create fact issues regarding whether Pershing made material misrepresentations to SGC financial advisors, whether it intended for Sanford to hear and rely on the alleged misrepresentations, whether Notowich relayed any of Pershing's alleged misrepresentations to Sanford, as well as whether Sanford actually or reasonably relied on the alleged misrepresentations in investing in SIBL CDs.

First, Pershing argues there is no evidence of any actionable misstatement Pershing made that could have indirectly made it to Sanford — that even if Pershing had made statements regarding being satisfied with due diligence of SGC to Sanford's financial advisor, Notowich, which Pershing does not concede occurred, such general statements are too vague to be material, and are mere puffery. Def.'s Br. 20. For a statement to be actionable in the context of common law fraud, "[t]he 'plaintiff must show the misrepresentation of a fact that exists at or before the time the representation is made.'" *Shtutman v. Carr*, 2017 WL 4402045, at *4 (N.J. Super. App. Div. 2017) (quoting *Suarez v. E. Int'l Coll.*, 428 N.J. Super. 10, 29 (App. Div. 2012)). "A statement is a matter of fact if it is 'susceptible of exact knowledge when the statement was made,'" as compared to mere puffery, "a matter of opinion [that] 'it is unsusceptible of proof' at that time." *Shtutman*, 2017 WL 4402045, at *4 (quoting *Joseph J. Murphy Realty, Inc. v. Shervan*, 159 N.J. Super. 546, 551 (App. Div. 1978)) (internal quotations omitted)).

MEMORANDUM OPINION AND ORDER – PAGE 15

Sanford argues that Pershing made representations about its backing of Stanford and satisfaction with its due diligence on SIBL, including statements to the effect that it was "clean and clear," *see, e.g.,* PL_APP_0569–70, in *Weatherly;* Def.'s App., PER-APP-2493; PER_APP_2068, 2089, in *Weatherly,* while "knowing full well that its due diligence into SIBL and Allen Stanford had resulted in many troubling issues and unanswered questions," Pl.'s Resp. 23; *see, e.g.,* Def.'s App., PER-APP-1206–07, 1200–01; PL_APP_0154–56, in *Weatherly.*   Pershing argues the alleged statements are insufficient as a matter of law to support an actionable claim for fraud and cites a number of cases standing for the general proposition that vague statements constitute mere puffery and are not actionable.   Def.'s Br. 20–21.   The Court determines, however, that the alleged fraudulent statements go beyond mere puffery.   Compare *In re Advanta Corp. Securities Litig.*, 180 F.3d 525, 538 (3d Cir. 1999) (quoting *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1428, n.14 (3d Cir.1997) ("Similarly, vague and general statements of optimism 'constitute no more than 'puffery' and are understood by reasonable investors as such.'), with *In re Bank of Am. Corp. Securities, Derivative, and Employee Ret. Income Sec. Act (ERISA) Litig.*, 757 F. Supp. 2d 260, 310 (S.D.N.Y. 2010) (distinguishing "opinion-based statements that are anchored in 'misrepresentation of existing facts'" from puffery in the context of securities fraud).   Thus, the alleged misstatements concerning the financial legitimacy of SIBL, SGC, and the SIBL CDs can support a claim for fraud.

Next, Pershing asserts that no evidence exists showing that Pershing intended Sanford to receive or rely on any alleged misrepresentations it made to the SGC financial advisors.   Def.'s Br. 24.   However, Sanford contends that the testimony of financial

advisors, the Brueckner Email, and the Pershing Bulletin all demonstrate that Pershing's statements were intended "to be passed on to *all* of the clients of the Stanford-related companies, *regardless of whether Pershing knew specifically who they were and whether the clients had invested in the SIBL CDs.*"  Pl.'s Resp. 28 (emphasis in original).  Indeed, the Pershing Bulletin includes a "sample letter" that firms "may choose to deliver to [their] clients regarding the protection and security that is offered to accounts held in custody at Pershing."  PL_APP_0315, in *Weatherly*.  Combined, the Pershing Bulletin, Brueckner's testimony that the Brueckner Email was designed to reassure advisors and clients regarding Pershing's financial shape in the midst of a tumultuous marketplace, *see* Pl.'s App., PL. APP. 0005, in *Bronstein*, and testimony from the financial advisors that Pershing encouraged the use of the Pershing name to sell CD's could lead a reasonable jury to find that Pershing had the requisite intent for the relevant representations Pershing made to SGC financial advisors to reach SGC clients, including Sanford, and for those clients to rely on those communications.

Pershing also posits that no evidence exists that any representation Pershing made was actually conveyed to Sanford.  Specifically, "[t]here is no evidence that [Notowich] relied on any information from Pershing or that he passed along information from Pershing to [Sanford]."  Def.'s Br. 19.   On this point, Sanford has provided a sworn declaration from Notowich stating that he understood that Pershing was required to perform due diligence on SGC prior to its formal partnership with SGC and noted Pershing's participation in recruiting SGC financial advisors and helping them to become "comfortable with the Stanford enterprise."  Notowich Declaration ¶¶ 5–6.  Moreover,

MEMORANDUM OPINION AND ORDER – PAGE 17

Sanford's testimony indicates assurances from Notowich factored into his decision to invest in SIBL CDs.   Def.'s App., PER-APP-4226–27, 4301–04.   This evidence is sufficient to create a fact issue regarding whether Pershing's representations regarding the legitimacy of the Stanford enterprise and the SIBL CDs were indirectly communicated to Sanford.

Finally, Pershing maintains that there is no evidence that Sanford actually relied on any alleged indirect misrepresentation of Pershing in making his investment decisions and neither its general involvement with SGC nor any instillation of a "general feeling of comfort" regarding the SIBL CDs can establish actual reliance.   Def's Br. 25–26.   Instead, it argues that Sanford purchased SIBL CDs solely on the recommendation of his neighbor, Larry Casey.   Def.'s Br. 18.   Pershing highlights that Sanford's first CD purchases occurred before Pershing's formal relationship with Stanford was established, Def.'s Br. 18, and that Sanford admitted that in deciding to purchase SIBL CDs, he did not rely on any information directly from or about Pershing, nor had he ever heard of Pershing or its relationship with SGC.   Def.'s App., PER-APP-2533, 2541.   On the other hand, Sanford testified that he relied on recommendations from both Casey and his SGC financial advisor, Notowich, who testified about his understanding that Pershing was required to perform due diligence on Stanford to partner with it, when making investment decisions regarding the SIBL CDs. Def.'s App., PER-APP-4301–04; Notowich Declaration ¶ 6.   Indulging all reasonable inferences in Sanford's favor, a genuine dispute of fact exists as to whether Sanford actually relied on any alleged misrepresentation of Pershing allegedly conveyed to him by Notowich.

MEMORANDUM OPINION AND ORDER – PAGE 18

Having considered the relevant and admissible evidence, the Court determines that Sanford has raised fact issues regarding each element of his indirect fraud claim sufficient to survive summary judgment.

### V. THE COURT DENIES SUMMARY JUDGMENT ON SANFORD'S PARTICIPATION IN BREACH OF FIDUCIARY DUTY CLAIM

Pershing's final argument is that Sanford's participation in breach of fiduciary duty claim fails on the merits.[8]  "The standard for civil aiding and abetting liability which has been adopted by the Third Circuit and New Jersey courts is the one set forth in the Restatement of Torts."  *Cafaro v. HMC Intern., LLC*, 2009 WL 1622825, at *4 (D.N.J. 2009) (citing *Failla v. City of Passaic*, 146 F.3d 149, 158 (3d Cir. 1998); *Judson v. Peoples Bank Trust & Co.*, 134 A.2d 761, 767 (N.J. 1957)).  Section 876(b) of the First and Second Restatements of Torts provides for liability of a party that "knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself."  RESTATEMENT (SECOND) OF TORTS § 876(b) (1979); RESTATEMENT (FIRST) OF TORTS § 876(b) (1939).  More specifically, aiding and abetting a breach of fiduciary duty requires a plaintiff to show: "(1) a breach of fiduciary duty; (2) the defendant's knowledge of and substantial assistance in that breach; and (3) damages resulting from the breach."  *Wiatt v. Winston & Strawn LLP*, 838 F. Supp. 2d 296, 307

---

[8] Sanford pleads a claim for "participation in breach of fiduciary duty."  Original Petition 28.  New Jersey law recognizes this claim as "aiding and abetting a breach of fiduciary duty."  *See generally Care One, LLC v. Straus*, 2022 WL 17042371 (N.J. Super. App. Div. 2022), cert. denied, 301 A.3d 1281 (N.J. 2023), and cert. denied, 301 A.3d 1287 (N.J. 2023), and cert. denied, 301 A.3d 1290 (N.J. 2023).

(D.N.J. 2012) (citing *McCormac v. Qwest Communications Intern., Inc.*, 387 N.J. Super. 469, 481–83, 904 A.2d 775 (N.J. App. Div. 2006); *see also Willekes v. Serengeti Trading Co.*, 2016 WL 5334522, at *8 (D.N.J. 2016); *Willekes v. Serengeti Trading Co.*, 783 F. Appx. 179, 185 (3d Cir. 2019) (unpub.). Pershing argues that Sanford cannot raise a fact issue regarding Pershing's knowledge of or substantial assistance in any alleged breach of fiduciary duty. Def.'s Br. 27. The Court disagrees. A genuine dispute of material fact exists regarding all elements of aiding and abetting a breach of fiduciary duty. Accordingly, the Court denies summary judgment on this claim.

The parties do not dispute that SGC, or Sanford's financial advisor Notowich, may have owed Sanford a fiduciary duty under New Jersey law. Def.'s Br. 27, n. 16; *see S.E.C. v. Pasternak*, 561 F. Supp. 2d 459, 499 (D.N.J. 2008) (quoting *F.G. v. MacDonell*, 696 A.2d 697, 703–04 (1997)) ("[A] fiduciary relationship 'arises between two persons when one person is under a duty to act for or give advice for the benefit of another on matters within the scope of their relationship.'"); *Kronfeld v. First Jersey Nat. Bank*, 638 F. Supp. 1454, 1467 (D.N.J. 1986) (noting that a fiduciary duty may exist where a stockbroker is "in a position of advising their customers or were under an obligation of trust or confidence"). Instead, Pershing first rejects the premise that it had knowledge of any particular fiduciary duty owed to Sanford given it "knew nothing about Plaintiff (or even of Plaintiff)." Def.'s Br. 28. Record evidence indicates that Pershing kept records of SGC brokers selling the SIBL CDs and the gross sales each made from selling SIBL CDs, including Notowich. Pl.'s Resp. 14; *see, e.g.*, PL_APP_0333,0346, in *Weatherly*. Moreover, in a related case, *Turk*, Pershing did not contest awareness of the Stanford

MEMORANDUM OPINION AND ORDER – PAGE 20

entities' fiduciary duty to investors.  *See Turk v. Pershing LLC*, 2014 WL 12572906, at *5, n.4 (N.D. Tex. 2014).  Given this evidence, a reasonable jury could find that Pershing had some awareness or knowledge of SGC's fiduciary duties to Sanford as an investor in SIBL CDs.

Pershing also maintains that no evidence has been put forth that Pershing possessed knowledge of a breach of fiduciary duty by SGC or anyone else, touting "actual knowledge," as the standard for aiding and abetting liability, as contrasted with general awareness or knowledge of red flags.  Def.'s Br. 28.  Pershing correctly notes that the Third Circuit has indicated that, for the purposes of aiding and abetting liability in the context of a securities violation, actual knowledge of the violation on the part of the aider and abettor is required.  *Monsen v. Consol. Dressed Beef Co., Inc.*, 579 F.2d 793, 799 (3d Cir. 1978); *see also Guerrier v. Advest, Inc.*, 1993 WL 90404, at *8 (D.N.J. 1993); *see also Cafaro*, 2009 WL 1622825, at *4 ("Thus, 'an aider and abettor must willfully and knowingly associate himself with another's unlawful act.'") (quoting *Failla*, 146 F.3d at 158).  However, this requirement is "less strict where the alleged aider and abettor derives benefits from the wrongdoing."  *Gould v. Am.-Hawaiian S. S. Co.*, 535 F.2d 761, 780 (3d Cir. 1976).  In such a case, a plaintiff must establish the alleged aider and abettor's "conscious involvement in impropriety or constructive notice of intended impropriety," *Gould*, 535 F.2d 761, 780, which can be demonstrated by a showing "that the alleged aider-abettor 'had general awareness that [its] role was part of an overall activity that [was] improper.'"  *Monsen*, 579 F.2d at 799 (quoting *SEC v. Coffey*, 493 F.2d 1304, 1316 (6th Cir. 1974)).  The Third Circuit, like the New Jersey courts, looks to the Restatement of

MEMORANDUM OPINION AND ORDER – PAGE 21

Torts for the requirements of aiding and abetting liability. Accordingly, the aiding and abetting standard laid out in *Monsen* and *Gould* is equally applicable to Sanford's claim for aiding and abetting a breach of fiduciary duty under New Jersey law.

Under this standard, Sanford has satisfied his burden of establishing a genuine dispute of material fact regarding whether Pershing possessed the requisite knowledge of Stanford's breach of fiduciary duty for aiding and abetting liability. Sanford argues Pershing derived substantial benefits from Stanford's wrongdoing by nature of its clearing relationship. *See generally* Def.'s App., PER-APP-0328–62. Although some Pershing employees testified that they were unaware that Stanford was running a Ponzi scheme, *see, e.g.,* Def.'s App., PER APP 1052–53, record evidence demonstrates that Pershing had concerns about the Stanford enterprise, including the substantial amount of Stanford's revenue stemming from SIBL CDs, and acted as its clearing broker for a period time despite those concerns. Def.'s Br. 29 (citing Def.'s App. 1199–1201, 1206–07, 365, 1924–26); PL_APP_0064–68, 0154–56, 0436–37, in *Weatherly*. Moreover, Sanford argues that "Pershing's relationship with Stanford underscores its awareness of Stanford's underlying fiduciary breaches." Pl.'s Br. 117. In support of this contention, Sanford points to evidence of Pershing's touted partnership with Stanford and provision of reputational enhancement and recruitment services despite access to concerning financial information and SGC's refusal to comply with a financial audit despite Pershing's persistent requests for information. Pl.'s Br. 16–17 (citing PL_APP_0572, 0089, 0082, 0064–68, 0437, in *Weatherly*); *see also* PL_APP_0154–56, 0569–70, in *Weatherly;* Def.'s App., PER-APP-1200–01, 0365.

MEMORANDUM OPINION AND ORDER – PAGE 22

Although Pershing posits that this evidence demonstrates nothing more than "red flags" insufficient to impose aiding and abetting liability, a reasonable juror could find that Pershing derived benefit from Stanford's wrongdoing, and, at a minimum, possessed a general awareness that it was participating in "'overall activity that [was] improper'" based on Pershing's support for Stanford despite Stanford's suspicious business model *Monsen*, 579 F.2d at 799 (quoting *Coffey*, 493 F.2d at 1316).  This is sufficient to create a genuine dispute of material fact regarding Pershing's knowledge of SGC's alleged breach of fiduciary duty to Sanford.  In other words, whether Pershing was consciously involved in or had constructive notice of SGC's breach of fiduciary duty is properly left to a jury to determine.

Finally, Pershing argues it is entitled to summary judgment on this claim because Sanford cannot prove that Pershing substantially assisted any alleged breach of fiduciary duty.  "Substantial assistance occurs when a defendant affirmatively assists, helps conceal or fails to act when required to do so, thereby enabling the breach to occur." *Lord Abbett Inv. Tr.-Lord Abbett Short Duration Income Fund v. Valeant Pharm. Intl., Inc.*, 2018 WL 3637514, at *6 (D.N.J. 2018) (quoting *Lerner v. Fleet Bank, N.A.*, 459 F.3d 273, 295 (2d Cir. 2006)).  Pershing correctly notes that the provision of routine or ministerial clearing services is not substantial assistance*. See Guerrier*, 1993 WL 90404, at *8.  However, like the plaintiffs in related case, *Turk*, Sanford has identified evidence that Pershing's services were more than ministerial or routine. *Turk v. Pershing LLC*, 2023 WL 36080, at *6 (N.D. Tex. 2023).  Sanford asserts that Pershing substantially assisted SGC by "recruiting Stanford [financial advisors], discussing SIBL CDs with the [financial advisors],

MEMORANDUM OPINION AND ORDER – PAGE 23

encouraging the financial advisors to use Pershing's name in recommending the CDs to investors, and engaging in and monitoring the CD sales – all while Pershing had knowledge of Stanford's underlying wrongdoing." Pl.'s Br. 18. A reasonable juror could find that these actions constitute affirmative assistance or helped conceal Stanford's wrongdoing, and there is evidence on the record sufficient to support such a fact issue.

Pershing contends that because Sanford makes no specific citations to the record in this section of his response brief, he has failed to produce evidence of substantial assistance. However, the actions Sanford identifies are supported by evidence in the record and cited to in other portions of the brief. Namely, evidence that Pershing led financial advisors to believe it was Stanford's partner, actively recruited and assisted in transitioning financial advisors to Stanford, encouraged the use of Pershing's name to sell SIBL CDs, performed arguably "perfunctory due diligence" on Stanford, and processed wire transfers for SGC. *See generally* PL_APP_0089, 0082, 0569, 0572, 0064–68, in *Weatherly*; Pl.'s App., Notowich Declaration ¶ 5; Def.'s App., PER-APP-0365, 2493, 2098, 0328–62; PER_APP_2155, 2160, in *Weatherly*. Indulging all reasonable inferences in Sanford's favor, this is sufficient to create a fact issue as to whether Pershing substantially assisted SGC's breach of fiduciary duty. Accordingly, summary judgment on Sanford's aiding and abetting a breach of fiduciary duty claim is denied.

## CONCLUSION

The Court cannot conclude as a matter of law that Sanford's claims are time-barred. Moreover, Sanford has raised fact issues as to all elements of both his fraud and participation in breach of fiduciary duty claims. Accordingly, Pershing is not entitled to

MEMORANDUM OPINION AND ORDER – PAGE 24

judgment as a matter of law, and the Court denies Pershing's motion for summary judgment.

Signed April 23, 2024.

David C. Godbey
Chief United States District Judge